# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN L. DOYNE HOSPITAL,   )
             )
     Plaintiff,    )
             )
   v.         )     Civil No. 1:07-CV-1592 JDB
             )
             )       **ECF**
MICHAEL O. LEAVITT, Secretary, U.S. )
  Department of Health and Human )
  Services,       )
             )
     Defendant.   )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant Michael O. Leavitt, Secretary of Health and Human Services, by and through his undersigned counsel, respectfully moves this Court for summary judgment on the grounds that there are no material facts in dispute and that Defendant is entitled to judgment as a matter of law. In support of the instant motion, the Court is respectfully referred to the accompanying Statement of Material Facts as to Which There is No Genuine Issue, and Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment. A proposed order is also attached.

Respectfully submitted,

_____
    /s/
JEFFREY A. TAYLOR
United States Attorney

_____/s/_____

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Registration No. 4202982
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____

ANDREW B. SPALDING
Attorney
D.C. Bar No. 501297
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
5309 Cohen Building
330 Independence Avenue S.W.
Washington, D.C.  20201
(202) 205-8705


OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN L. DOYNE HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:07-CV-1592 JDB |
| | ) | |
| | ) | **ECF** |
| MICHAEL O. LEAVITT, Secretary, U.S. | ) | |
| Department of Health and Human | ) | |
| Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant Michael O. Leavitt, the Secretary of Health and Human Services ("the Secretary") submits the following statement of material facts as to which there is no genuine issue in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

1.     John L. Doyne Hospital ("John Doyne" or "the Hospital") was a Medicare provider that was owned and operated by Milwaukee County ("the County") in Milwaukee, Wisconsin. Administrative Record ("A.R.") 770.

2.     Under the Milwaukee County Code, any employee who had worked for any County agency for 15 years was entitled to postretirement health benefits. A.R. 771. Accordingly, the postretirement health benefits of a Hospital employee would vest when that employee passed the 15-year threshold. Id.

3.     For business reasons, the Hospital elected to close on December 22, 1995, thus terminating

its Medicare provider agreement.  A.R. 770.

4.    Prior to its closure, the Hospital made postretirement health benefits payments to former Hospital employees who had retired.  A.R. 771.  The Hospital continued to make such payments to former Hospital employees after it closed.  Id.

5.    The Hospital's postretirement health benefits plan was unfunded, meaning that the Hospital had not set aside any funds in a custodial bank account, trust account, or with an insurance company to cover the cost.  Pl.'s Mem. at 12; Provider Reimbursement Manual ("PRM") 2140.3.B.1.

6.    In May of 1996, the Hospital filed its final Medicare cost report with the intermediary, United Government Services.  A.R. 772.

7.    The Hospital estimated the amount that it would pay in the future for vested postretirement health benefits, then multiplied this estimate by the Medicare reimbursement rate of 5.816% and included that figure as a claim in its cost report.  A.R. 772.

8.    In July of 1998, prior to the intermediary issuing its Notice of Program Reimbursement ("NPR"), the Hospital sent a letter to the Intermediary amending its original estimation of the amount it would pay in the future for the postretirement health benefits.  A.R. 772.  This amended report revised the original estimation based on the actual payments made by the Hospital in the two-year period between the original cost report and the amendment.  A.R. 772.

9.    According to the amended report, the amount that Medicare owed the hospital for postretirement health benefits was $8,140,171.  A.R. 772.

10.    The intermediary disallowed the claim, and the Hospital subsequently appealed to the Provider Reimbursement Review Board ("PRRB").  A.R. 773.

2

11.     For the appeal, the Hospital provided yet another estimation of the future cost of the postretirement health benefits, based again on actual payments that the Hospital had made since its previous estimation.  A.R. 773.  According to this third calculation, the proper amount that Medicare was allegedly obligated to reimburse the Hospital was $12,107,189.  A.R. 774.

12.     After the PRRB affirmed the disallowance and the Administrator of CMS declined to review the PRRB decision, the Hospital filed this action.  Comp. at 1.

13.     In its Motion for Summary Judgment, the Hospital again adjusted its estimate of Medicare's share of the benefits, and submitted the figure of $11,049,847.  Pl.'s Mem. at 7.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney

_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Registration No. 4202982
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372

_____/s/_____
ANDREW B. SPALDING
Attorney
D.C. Bar No. 501297
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
5309 Cohen Building
330 Independence Avenue S.W.
Washington, D.C.  20201
(202) 205-8705

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN L. DOYNE HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:07-CV-1592 JDB |
| | ) | |
| | ) | **ECF** |
| MICHAEL O. LEAVITT, Secretary, U.S. | ) | |
| Department of Health and Human | ) | |
| Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John L. Doyne Hospital ("John Doyne," "the Hospital" or "Plaintiff") was a hospital that furnished services to Medicare beneficiaries until it closed its doors and terminated its participation in Medicare in 1995. In its final cost report, the Hospital requested Medicare reimbursement for a percentage of the estimated future cost of the postretirement health benefits of former employees. The Secretary of the U.S. Department of Health and Human Services Michael O. Leavitt ("the Secretary" or "Defendant") disallowed the claim, and the Hospital now seeks judicial review of the Secretary's final decision.

The Secretary disallowed the claim because the applicable regulation plainly states that the costs of the particular kind of benefits plan at issue – an unfunded postretirement health benefits plan – may only be reimbursed in the years that the provider makes payments to former employees. In contrast to other expenses that Medicare reimburses, the amount of liability that a Medicare provider of services actually incurs for these plans cannot be known until the provider

makes an actual payment. To ensure accuracy in Medicare reimbursement, the Secretary has therefore determined that such costs will not be reimbursed unless and until the provider pays the former employee. Because the Hospital is requesting reimbursement for postretirement health benefits payments that were not made prior to submitting its final cost report, the Hospital's claimed cost is unallowable.

As shown below, the Secretary's decision is both reasonable and in accordance with the Medicare statute and validly promulgated regulations, and should be sustained.

## STATUTORY AND REGULATORY BACKGROUND

### I.  The Medicare Program Generally

Title XVIII of the Social Security Act ("Medicare statute") establishes the Medicare program, a federally funded health insurance program that provides payment for covered services furnished to aged and certain disabled persons. See generally 42 U.S.C. §§ 1395-1395ggg. Part A of the Medicare program authorizes payment for covered institutional care, including hospital care, post-hospital extended care services and home health services. 42 U.S.C. §§ 1395c, 1395d, 1395i, 1395x(b), (i). Part B of the Medicare program covers certain outpatient services such as physician services, medical supplies, x-rays and laboratory tests. 42 U.S.C. §§ 1395k, 1395l, 1395x(s). The Medicare program is administered by the Centers for Medicare & Medicaid Services ("CMS"), which is a component agency of the Department of Health and Human Services.[1]

Part A services are furnished by "providers of services," which include hospitals such as

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA"). The agency was renamed CMS in 2001. 66 Fed. Reg. 35,437 (July 5, 2001).

2

John Doyne.  42 U.S.C. § 1395x(u).  Providers of services must enter into agreements with the Secretary in order to participate in and obtain payment from the Medicare program.  See 42 U.S.C. §§ 1395g, 1395cc.  During the periods at issue in this case, Part A reimbursement was made through a "fiscal intermediary," a private entity that acts as the Secretary's agent.  42 U.S.C. § 1395h (1995).  Each provider submits to an intermediary at the end of its fiscal year a cost report setting forth all costs for which the provider claims reimbursement.  42 C.F.R. § 405.1801(b)(1).  The intermediary then reviews the cost report and determines in an Notice of Program Reimbursement ("NPR") how much reimbursement is actually due the provider for that cost year.

A provider that is dissatisfied with a final determination of the intermediary as to the amount of reimbursement due may, upon compliance with the statutorily-imposed jurisdictional requirements, request a hearing before the Provider Reimbursement Review Board ("PRRB").  42 U.S.C. § 1395oo(a), (b).  If all the jurisdictional prerequisites are satisfied and the PRRB has the authority to decide the matter at issue, see 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842, the PRRB may hold a hearing and issue a decision that is potentially subject to further review by the Secretary's delegate, the CMS Administrator.  See 42 C.F.R. § 405.1875.  The Medicare statute authorizes a provider to request judicial review of the final agency decision in federal district court within 60 days of the provider's receipt of the final decision of either the PRRB or the Secretary, if the Secretary reverses the PRRB's decision.  42 U.S.C. § 1395oo(f)(1).

## II.  Reasonable Cost and the Accrual Method of Accounting

John Doyne received reimbursement for the postretirement health benefits at issue in this case on a "reasonable cost" basis.  42 U.S.C. § 1395x(v)(1)(A).  The Medicare statute provides

3

that reasonable cost "shall be determined in accordance with regulations establishing the method

or methods to be used, and the items to be included, in determining such costs . . . ." 42 U.S.C.

§ 1395x(v)(1)(A).   The regulatory regime that defines and applies the concept of reasonable cost

has evolved measurably in the last several decades, driven by the policy of improving accuracy

in reimbursement.   In the early 1970s, the Secretary observed that the Medicare reimbursement

procedures in place at that time frequently resulted in providers "passing on inefficient and

excessive expenses" to Medicare.   Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 405 (1993).

To reduce such unnecessary and inefficient expenses, Congress in 1972 amended the statutory

definition of reasonable cost.   Id.   The Medicare statute now defines "reasonable cost" as "the

cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in

the efficient delivery of needed health services . . . ." 42 U.S.C. § 1395x(v)(1)(A).   This

definition has two key components, both of which are designed to ensure greater accuracy in

reimbursement.   First, unnecessary and inefficient expenses are excluded from reimbursement.

Second, an allowable cost must have been "actually incurred," not merely estimated or projected.

One set of regulations that the Secretary has long used to determine reasonable costs are

those prescribing the method of accounting that the Secretary employs in this task.   The

Secretary has generally adopted, with some notable exceptions, the accrual method (or "accrual

basis") of accounting.   Under the accrual method, as defined in the Secretary's regulations,

"revenue is reported in the period in which it is earned, regardless of when it is collected; and an

expense is reported in the period in which it is incurred, regardless of when it is paid." 42 C.F.R.

§ 413.24(b)(2).   Applied specifically to Medicare, this has generally meant that providers may

seek reimbursement for costs only in the cost reporting period in which those costs are incurred,

regardless of when they may be paid.   Because the accrual method was generally regarded as

"the most accurate basis for determining costs," the Secretary determined that this method would

generally further the goal of reimbursement accuracy.  51 Fed. Reg. 34,790, 34,800 (Sept. 30,

1986).

      Experience in applying the accrual method to the Medicare reimbursement scheme

eventually taught that certain limited modifications or exceptions to the accrual method would be

necessary to ensure accurate reimbursement.  For certain categories of costs, application of the

pure accrual method would often lead the Secretary to reimburse providers in amounts that far

exceeded their actual costs, thus defeating the stated purpose of the accrual method.  As the

Secretary explained in detail in the Federal Register, the application of the accrual method had

allowed some providers to claim costs without "the assurance that liabilities associated with

accrued costs will ever be fully liquidated through an actual expenditure of funds."  60 Fed. Reg.

33,126 (Jun. 27, 1995).  Costs were reported, and ultimately reimbursed, although those costs

were never actually paid out.

      To illustrate, the Secretary provided the example of unfunded sick leave plans.  Under

some employment contracts, vested sick leave benefits are later forfeited if the employee is

dismissed for cause.  Id.  Using the unmodified accrual method of accounting, the provider could

seek and receive reimbursement for those sick leave days when the cost is incurred, but then not

actually pay out the benefit if the employee is later dismissed for cause.  In effect, the provider

never actually became liable for the cost, although Medicare had reimbursed the provider for that

cost.  Categories of costs for which this inefficiency had become significant included sick leave,

FICA taxes, and, most importantly for this case, deferred compensation.  Id.  In sum, application

of the accrual basis of accounting to the reimbursement of deferred compensation frequently

resulted in an inaccurate reimbursement, thus defeating the purpose of the Secretary's

reimbursement regime.  Worse yet, by reimbursing providers for costs that they would never

incur, Medicare was not reimbursing for "actual costs," arguably violating 42 U.S.C.

§ 1395x(v)(1)(A).

Accordingly, the Secretary found it appropriate to carve out certain categories of costs

that are subject to special restrictions concerning the cost reporting period in which providers

may seek reimbursement.   These categories are enumerated in the regulations, and include

vacation pay, sick pay, FICA taxes, and again, deferred compensation.  42 C.F.R. §

413.100(c)(2)(i-viii).  These are categories of costs for which liquidation is inherently

unpredictable – they might eventually be liquidated at the projected amount, or at an amount that

is modified later, or they may never be liquidated at all.  In thus adapting the accrual method of

accounting to the needs of the Medicare system, the government avoids unnecessary

reimbursement, resulting in a more cost-effective and equitable reimbursement regime that

allows Medicare to "minimize the unwarranted payment of Federal funds."  60 Fed. Reg. at

33,126.

## III.  Deferred Compensation and Postretirement Health Benefits

The Medicare regulations expressly recognize the benefits involved in this case –

postretirement health care benefits – as potential reasonable costs and categorize them as a type

of deferred compensation.  42 C.F.R. § 413.100(c)(2)(vii)(A).  The Secretary defines deferred

compensation in his Provider Reimbursement Manual ("PRM"), CMS Pub. 15-1, which is

published and distributed to providers and can be found at

http://www.cms.hhs.gov/Manuals/PBM/.  Section 2140 in chapter 21 of the PRM defines

deferred compensation as "remuneration currently earned by an employee but which is not

received until a subsequent period, usually after retirement" and explains that "a deferred

compensation plan defers the receipt of income beyond the year in which it is earned."  PRM

2140.1.  Recognizing that such deferment creates the substantial possibility that the actual cost to

the provider may ultimately differ from the cost that is originally projected, the PRM requires

that "[p]rovider contributions for the benefit of employees under a deferred compensation plan

are reimbursable when, and to the extent that, such costs are *actually incurred* by the provider."

PRM 2140.2 (emphasis added).

　　　　For costs related to deferred compensation, the regulations provide that the timing of

reimbursement depends on when the costs will be liquidated:  "Medicare does not recognize the

accrual of costs unless the related liabilities are liquidated timely."  42 C.F.R. § 413.100(c)(1).

Whether the cost of vested postretirement health care benefits is allowable in the year of accrual

depends, then, on whether those benefits will be liquidated timely.

　　　　The regulations further provide that the meaning of timeliness depends on whether the

postretirement health care benefits plan is "funded" or "unfunded."  42 C.F.R. §

413.100(c)(2)(vii)(B).  The difference between a funded and an unfunded plan is explained in the

PRM.  A funded plan is one in which "contributions are systematically made as a specific

provision of the plan to a funding agency," such as a trustee, an insurance company, or a

custodial bank account, "for the purpose of meeting retirement benefits."  PRM 2140.3.B.1.  The

funds must be used to either purchase an insured plan with the insurance company, or to

establish funds either in a custodial bank account or in a trust fund.  Id.  If the plan is funded,

then the cost is allowed in the year of accrual if the liability will be liquidated in 1-3 years.  42

C.F.R. § 413.100(c)(2)(vii)(B).

By contrast, if the cost is unfunded, it is allowed only in the cost reporting period in

which actual payment is made to the beneficiary.  42 C.F.R. § 413.100(c)(2)(vii)(A).

The Secretary restates this principle in the PRM:  "Provider payments under unfunded deferred

compensation plans are considered an allowable cost only when actually paid to the participating

employees, or their beneficiaries."  PRM 2140.2.  The Secretary has determined that unfunded

deferred compensation plans, including postretirement health benefits plans, are among the most

difficult to predict the cost actually incurred.  Accordingly, the Secretary has applied the strictest

standard for the timeliness of their liquidation:  such costs are allowable only in the year that

actual payment is made.

The policy behind treating unfunded plans differently is simple:  if the provider has not

yet committed funds to finance future benefits, neither will Medicare.  In effect, Medicare defers

to the provider's level of commitment to funding the plan.  Where a provider has not yet set

aside funds to cover the cost, Medicare will not reimburse for that cost.  The Secretary has found

this to be the most effective way to ensure the accuracy of the ultimate reimbursement.

## STATEMENT OF FACTS AND ADMINISTRATIVE PROCEEDINGS

### I.  Factual Background

John L. Doyne Hospital was a Medicare provider that was owned and operated by

Milwaukee County in Milwaukee, Wisconsin.  Administrative Record ("A.R.") 770.[2]  Under the

---

[2] The Administrative Record includes a Joint Stipulation of Facts entered into by the parties to
the PRRB hearing.  A.R. 768-75.  Those parties included the Hospital and the Intermediary only.
A.R. 770.  Contrary to the Hospital's assertion that the parties to this appeal entered into the

Milwaukee County Code, an employee who had worked for any County agency for 15 years was entitled to postretirement health benefits. A.R. 771. Accordingly, the postretirement health benefits of a Hospital employee would vest when that employee passed the 15-year threshold. Id.

For business reasons, the Hospital elected to close on December 22, 1995, thus terminating its Medicare provider agreement. Prior to its closure, the Hospital made postretirement health benefits payments to former Hospital employees who had retired. A.R. 771. The Hospital continued to make such payments to former Hospital employees after it closed. Id. The Hospital's postretirement health benefits plan was unfunded, meaning that the Hospital had not set aside any funds in a custodial bank account, trust account, or with an insurance company to cover the cost. Pl.'s Mem. at 12; PRM 2140.3.B.1.

In May of 1996, the Hospital filed its final cost report with its intermediary, United Government Services. A.R. 772. The Hospital estimated the amount that it would pay in the future for vested postretirement health benefits.[3/]   Id.  It multiplied this estimate by the Medicare

---

Joint Stipulation as to all matters, the Secretary was not a party to the PRRB hearing and is not a party to the Joint Stipulation. Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") at 5; 42 C.F.R. § 405.1843(a); see also Howard Young Medical Center Inc. v. Shalala, 207 F.3d 427, 443 (7th Cir. 2000) ("we do not consider the Secretary bound by the stipulation entered into at the PRRB hearing by counsel for the hospital and counsel for the intermediary.").

[3/] The Secretary agrees with the Hospital that the methodology it used to estimate the future cost of the benefits is not an issue in this case. See Pl.'s Mem. at 5 fn. 2. However, the Secretary takes issue with the assertion, which the Hospital contends is "important to emphasize," that "all the entities to whom this methodology has been presented – which include the Intermediary, the PRRB, and the CMS Administrator – have not disputed the methodology." Pl.'s Mem. at 9. It should be clarified that none of these entities has ruled on this methodology to any extent. The Intermediary and the PRRB did not reach the issue of the validity of the methodology because they found the costs categorically unallowable. A.R. 14-19. The

reimbursement rate of 5.816% and included that figure as a claim in its cost report.[4]  A.R. 772.

Subsequent to filing its report, the Hospital  found that the payments it continued to make to beneficiaries did not track the original projections.  Pl.'s Mem. at 6-9.  The Hospital has therefore repeatedly adjusted its estimation of the future costs of these benefits.  The first adjustment occurred in July of 1998, before the Intermediary issued its decision. The Hospital sent a letter to the Intermediary that amended its original estimation of the amount the Hospital would pay in the future for the postretirement health benefits.  A.R. 772.  This amended report revised the original estimation based on the cost of benefits that the Hospital had paid in the two-year period between the original cost report and the amendment.  A.R. 772.  According to the amended report, the amount that Medicare owed the Hospital for postretirement health benefits was $8,140,171.  A.R. 772.

## II.  **Administrative Proceedings and Related Adjustments to the Estimate**

On January 18, 2000, the Intermediary issued its NPR.  A.R. 773.  Adjustment 45A on the NPR indicated that the claimed postretirement health benefits were not allowable under Medicare regulations.  A.R. 773.

The Hospital appealed the NPR to the PRRB.  A.R. 773.  Pursuant to this appeal, the Hospital provided yet another estimate of the future cost of the postretirement health benefits,

---

Administrator declined to review the case in its entirety.  A.R. 1.  Contrary to the implication of the Hospital's argument, the methodology has not been approved by the Intermediary or the PRRB, much less the Administrator.  To the extent that it is "unchallenged" by the Intermediary, PRRB, and Administrator, Pl.'s Mem. at 9, this is only because was never reached.

[4] The record does not appear to contain the original estimate of the future cost of the postretirement health benefits.  The Secretary assumes that the original estimate was materially different from the revised estimate included in the amended cost report.

based again on actual payments that the Hospital had made since its previous estimation.  A.R. 773.  This third calculation proved, again, that the previous projections were not accurate.  The proper amount that Medicare was allegedly obligated to reimburse the Hospital was not the original figure, or the amended figure of $8,140,171, but rather, $12,107,189, a increase of nearly 50%.  A.R. 774.

The PRRB affirmed the Intermediary's disallowance of the costs.  A.R. 14-19.  The PRRB relied on 42 C.F.R. § 413.100(c)(2)(vii), which provides that an unfunded postretirement health benefits plan is an allowable cost only in the year in which actual payment is made to the participating employee.  A.R. 18.  No actual payments had been made to the Hospital's former employees at the time that the cost report was filed, and the PRRB accordingly concluded that the Hospital's estimated future costs for these benefits were not allowable.  A.R. 19.

On July 9, 2007, the Administrator issued notice that he had declined to review the decision of the PRRB.  A.R. 1.  The PRRB decision thus became the agency's final decision, and on September 9, 2007, the Hospital filed a Complaint seeking judicial review of that decision.  On May 9, 2008, the Hospital filed a Motion for Summary Judgment and supporting papers that contained a fourth calculation of the estimated cost of the benefits, which was $11,049,847, a decrease of approximately $1 million.  Pl.'s Mem. at 7.

## ARGUMENT

### I.  Plaintiff Failed to Comply with Local Rule 7(h).

As an initial matter, Plaintiff's Memorandum in support of its Motion for Summary Judgment states that "[t]here are no disputed material facts." Pls.' Mem. at 1.  While Defendant agrees that all material facts in this case are those found in the record under the Medicare statute, 42 U.S.C. § 1395oo(f)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2), and

that there are no triable issues of fact, the Hospital nonetheless failed to comply with the Local

Rules by not filing a Statement of Material Facts.  See LCvR 7(h), 56.1.

Local Rule 7(h) requires that a motion for summary judgment "shall be accompanied by a

statement of material facts as to which the moving party contends there is no genuine issue,

which shall include references to the parts of the record relied on to support the statement."

LCvR 7(h); see also LCvR 56.1. Contrary to this rule, the Hospital provided no statement of

material facts.

## II.  The Standard of Review for Cases Involving the Secretary's Interpretation of his Reasonable Cost Regulations is Highly Deferential.

Jurisdiction over this action is based on 42 U.S.C. § 1395oo(f)(1), which provides for

judicial review of final Medicare provider reimbursement decisions under the terms of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 702 et seq.; Marymount Hosp., Inc. v.

Shalala, 19 F.3d 658, 661 (D.C. Cir. 1994).  Pursuant to the APA, the Administrator's decision

may be set aside only if it was "arbitrary, capricious, an abuse of discretion, otherwise not in

accordance with the law," or "unsupported by substantial evidence . . . reviewed on the record of

an agency hearing provided by statute."  5 U.S.C. § 706; Citizens to Preserve Overton Park, Inc.

v. Volpe, 401 U.S. 402, 413-14 (1971); Marymount Hosp., 19 F.3d at 661.

The arbitrary and capricious standard is "highly deferential" to agency decisionmaking

and "presumes the validity of agency action."  Nat. Mining Ass'n v. Mine Safety and Health

Admin., 116 F.3d 520, 536 (D.C. Cir. 1997) (internal citation omitted).  Under the arbitrary and

capricious standard, a court is to determine "'whether the decision was based on a consideration

of the relevant factors and whether there has been a clear error of judgment.'"  Michigan Consol.

Gas Co. v. FERC, 883 F.2d 117, 120 (D.C. Cir. 1989) (quoting Motor Vehicle Mfrs. Ass'n, Inc.

v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal citation omitted); see also

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). As part of this task,

a court must determine whether "the agency . . . articulate[d] a satisfactory explanation for its

action including a 'rational connection between the facts found and the choice made.' " Motor

Vehicles Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines, Inc. v. United States, 371

U.S. 156, 168 (1962)). The scope of review under the "arbitrary and capricious" standard is

narrow and a court is not to substitute its judgment for that of the agency. Motor Vehicles Mfrs.

Ass'n. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983); see also Citizens to Preserve

Overton Park, 401 U.S. at 416; Chadmoore Communications, Inc. v. FCC, 113 F.3d 235, 241

(D.C. Cir. 1997).

The distinction, if any, between "arbitrary and capricious review" and review for "abuse

of discretion" is subtle. See Block v. Pitney Bowes Inc., 952 F.2d 1450, 1454 (D.C. Cir. 1992);

see also Section of Administrative Law, American Bar Association, Scope-of-Review Doctrine:

Restatement and Commentary, 38 ADMIN.L.REV. 233, 292 (1986) (in dealing with components

of review under the APA catch-all scope-of-review provision, 5 U.S.C. § 706(2)(A),

commentators drew no distinctions among the terms "arbitrary, capricious, [or] an abuse of

discretion").[5]

Similarly deferential is review under the substantial evidence standard. A reviewing

---

[5]  Those courts that have attempted to consider separately the "abuse of discretion" standard
have noted, among other things, that an abuse of discretion by an agency can be found "if there is
no evidence to support the decision or if the decision is based on an improper understanding of
the law," see Jaimez-Revolla v. Bell, 598 F.2d 243, 246 (D.C. Cir. 1979) (internal citation
omitted); when an agency's decision is found to have "rested on an impermissible basis . . . or . . .
on other 'considerations that Congress could not have intended to make relevant,'" Chadha v.
INS, 634 F.2d 408, 429 (9th Cir. 1980), aff'd, 462 U.S. 919, 103 S. Ct. 2764 (1983); or when a
decision is made without a rational explanation or departs from established policies. See, e.g.,
Osuch v. INS, 970 F.2d 394, 396 (7th Cir.1992).

court should accept the agency's factual findings based on the record made below if those findings are supported by substantial evidence on the record as a whole. Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). The Supreme Court "has defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Id. at 620.

An agency's interpretation of an ambiguous statute that is contained in a substantive rule or that is the product of formal adjudication is entitled to deference so long as it is reasonable. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845 (1984). Agency interpretations of statutes set forth in policy statements or agency manuals are "'entitled to respect,' . . . to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

The Secretary's interpretation of his own regulations, on the other hand, is entitled to "substantial deference," and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)); see also Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 151 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique

14

expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers"); Lyng v. Payne, 476 U.S. 926, 939 (1986) ("agency's construction of its own regulations is entitled to substantial deference").  A court must defer to the Secretary's interpretation of a regulation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson Univ., 512 U.S. at 512.

The substantial weight and deference normally owed agency action reviewable under the APA is particularly appropriate where, as here, the Secretary has interpreted and applied the Medicare statute, and the regulations duly promulgated under his interpretation of "reasonable costs" are thus entitled to "considerable deference." Sun Towers, Inc. v. Heckler, 725 F.2d 315, 325 (5th Cir. 1984) (internal citation omitted); see also Butler County Memorial Hosp. v. Heckler, 780 F.2d 352, 356 (3d Cir. 1985) (inasmuch as "Congress described only sparsely the means of assessing reasonable costs owed to Medicare providers, and instead assigned the primary responsibility for such assessments to the Secretary," the courts must be cautious lest [they] disturb this appropriate allocation of governmental functions.").

Finally, federal courts, including the D.C. Circuit, have long recognized that "Congress granted the Secretary broad discretion to develop the 'reasonable cost' [reimbursement] concept . . . enunciated in 42 U.S.C. § 1395x(v)(1)(A)." Richey Manor, Inc. v. Schweiker, 684 F.2d 130, 134 (D.C. Cir. 1982); see Humana, Inc. v. Heckler, 758 F.2d 696, 699 (D.C. Cir. 1985) (noting that "[i]t is undisputed that Congress, in the statute, granted broad discretion to the Secretary to develop the 'reasonable cost' concept through regulations."); see also Lexington County Hosp.

15

v. Schweiker, 740 F.2d 287, 290 (4th Cir. 1984); Mercy Hosp. of Laredo v. Heckler, 777 F.2d

1028, 1034 (5th Cir. 1985); Sun Towers, Inc. v. Heckler, 725 F.2d 315, 325 (5th Cir. 1984), cert.

denied 469 U.S. 823 (1984). The Secretary has exercised this discretion by promulgating

regulations and manual provisions that develop the reasonable cost reimbursement concept.

Although the Hospital does not directly challenge the Secretary's regulations before this

Court, it is important to note that the Secretary is vested with vast discretion to apply the

principles of reasonable cost reimbursement, through application of his regulations and manual

provisions. Thus, the Secretary has the authority to articulate principles regarding the

reimbursement of individual costs that are "actually incurred." See 42 U.S.C. § 1395x(v)(1)(A);

see also 42 C.F.R. § 413.9(a)(1) ("Reasonable cost of any services must be determined in

accordance with regulations establishing the method or methods to be used."); Medical

Rehabilitation Services, P.C. v. Shalala, 17 F.3d 828, 830 (6th Cir. 1994) (noting that the

Secretary prescribes methods for determining a provider's "reasonable cost" in regulations,

guidelines, letters, and the PRM).

**III. The Costs at Issue are Not Allowable Under the Reasonable Cost Regulations.**

The Hospital does not dispute that the costs at issue are for an unfunded postretirement

health benefits plan. Pl.'s Mem. at 12. Accordingly, the applicable reasonable cost regulation

that the Secretary has promulgated to ensure that these costs are reimbursed only to the extent

"actually incurred" is 42 C.F.R. § 413.100(c)(2)(vii)(A), which plainly permits reimbursement

only in the year that the costs are actually liquidated. As evident in the text of that regulation, in

the administrative proceedings below, and in the argument now advanced before this Court, the

Secretary has determined that this regulation should apply with equal force whether the provider

16

remains open during liquidation or not. Disallowing the cost of unfunded postretirement health benefits until liquidation, regardless of closure, furthers the policy of ensuring accuracy in reimbursement. Far from being "arbitrary" or "capricious," the Secretary's decision is simply the natural result of a policy that is clearly articulated and broadly applied throughout the statute and regulations. It is therefore entitled to substantial deference and should be upheld.

### A. The Inability to Accurately Predict the Cost of the Benefits Demonstrates Why the Secretary Reimburses for Such Costs Only Upon Liquidation.

The facts of this case provide a perfect illustration of why the Secretary will not reimburse providers for unfunded postretirement health benefit plans until the liabilities are actually liquidated. Consider the wide variations in the health benefits cost which the Hospital has, at various times in these proceedings, claimed to have incurred. In 1996, when the Hospital submitted its initial cost report, it provided an estimate that represented the Hospital's best effort to project the future costs of the benefits, using "well established [sic] actuarial assumptions." Pl.'s Mem. at 6. However, as the Hospital has begun making actual payments under the plan, it has discovered and rediscovered several times over that even using the best available methodology, the liquidation amount of these benefits cannot be predicted accurately.

After a mere two years of making actual payments to the beneficiaries of the plan, the Hospital realized that its original projection was off the mark. It submitted an amended cost report to the intermediary requesting $8,141,935 from Medicare for the benefits. Then just two years later, in preparation for the PRRB hearing, it reexamined its revised calculations and found, again, that they were even more inaccurate than originally believed. The revised Medicare percentage of the benefits cost became $12,107,189, an increase from its previously revised number of almost 50%. Finally, the Hospital provided a fourth figure in its Motion for

17

Summary Judgment.  Again revised in light of payments actually made, the Hospital estimated

that Medicare's percentage of the total value of these benefits was roughly $11.05 million, this

time a decrease of over $1 million.

The Secretary generally acknowledges the Hospital's good faith effort to identify the

costs it incurred for these benefits, especially when the revision is lower, not higher, than the

previous figure.  However, the wide fluctuations demonstrate precisely why the Secretary has

decided not to allow unfunded postretirement health benefit costs prior to their liquidation.  The

amount that the provider actually incurs for these costs simply cannot be known in advance with

any reasonable degree of accuracy.  In repeatedly making substantial revisions to the projected

costs, the Hospital makes the Secretary's case.

### B.  The Secretary's Deferred Compensation Regulations are Specifically Designed to Prevent Cost-Shifting, and Had Precisely that Effect in This Case.

Because the unfunded postretirement health benefit costs are not allowable, the

Secretary's decision has not effected a cost-shifting, as the Hospital contends.  Pl.'s Mem. at 23-

26.  To the contrary, the reimbursement procedures explained above are specifically designed to

prevent cost-shifting, and this case demonstrates how that is accomplished.  Rather than

effecting a cost-shifting, the Secretary's disallowance in this case actually prevented one.

The cost-shifting clause of the reasonable cost statute provides that reasonable costs shall

be determined so that the costs of "efficiently" delivering Medicare services "will not be borne

by individuals not so covered, and the costs with respect to individuals not so covered will not be

borne by such insurance programs . . . ."  42 U.S.C. § 1395x(v)(1)(A)(I).  The reasonable cost

rules are designed specifically to ensure that Medicare should bear its fair share of the costs,

nothing more and nothing less.  As numerous circuits have affirmed, a cost that is otherwise

18

unreasonable and is therefore disallowed does not become allowable simply because persons who non-Medicare individuals would ultimately pay for it; otherwise, every disallowance would constitute a cost-shifting.  See, e.g., Detroit Receiving Hosp. v. Shalala, 194 F.3d 1312 (table), 1999 WL 970277, at *6 (6th Cir. Oct. 15, 1999) ("following the Hospital's argument to its logical end would prohibit [the agency] from denying any [costs] because of the chance that costs might be shifted to non-Medicare patients in some way"); Sun Towers v. Heckler, 725 F.3d 315, 333 (5th Cir. 1984) ("no cost could ever be disallowed for reimbursement purposes because to do so would tend to shift the cost to non-Medicare patients") (quoting Pasadena Hospital Assoc. v. U.S., 618 F.2d 728, 735 (Ct. Cl. 1980)).

By the plain meaning of the text, cost-shifting can occur in either of two directions: by shifting costs that Medicare should bear onto those who should not bear them, or by shifting onto Medicare costs that should be borne by others.  Once again, the specific cost figures asserted at various times by the Hospital serve to illustrate the policies behind the Secretary's disallowance. Had the Secretary decided to reimburse the Hospital at any time prior to the filing of its Complaint, the Secretary would have provided an amount of money that, by the Hospital's own account, would not have been correct.  Specifically, had the Secretary based a reimbursement decision on the revised number provided to the PRRB of over $12 million, rather than the roughly $11 million claimed in the Complaint, the Secretary would, by the Hospital's own admission, have paid too much.  Such a premature reimbursement would have effected a cost-shifting, as that term is defined in the statute:  the difference between what the Secretary would have paid and what the Hospital now contends the Secretary should pay would have been money paid by the Medicare program that should have been borne by other, non-Medicare individuals.

19

The facts illustrate that disallowing reimbursement for unfunded postretirement health benefit costs until they are liquidated is the only effective way to prevent cost-shifting.

### C.  The Social Security Act Does Not Contemplate Reimbursement to Non-Providers.

The Hospital contends that the specific regulation governing unfunded postretirement health benefits, 42 C.F.R. § 413.100(c)(2)(vii)(A), "does not preclude a provider from seeking Medicare reimbursement for such costs after a provider has terminated its participation in the Medicare program."  Pl.'s Mem. at 15.  While it is strictly true that this particular regulation does not expressly preclude a non-provider from submitting a cost report, the Hospital reads this regulation in a vacuum.  Both the Medicare Act and the reasonable cost regulations are absolutely consistent in stating that only current Medicare providers are eligible for Medicare reimbursement.  This broader statutory and regulatory principle has not been challenged in this case, as indicated in the Hospital's prayer for relief.  Comp. at 13-14.

The introductory language to the section of the Social Security Act that concerns reimbursement to providers states, "[t]he Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it."  42 U.S.C. § 1395g(a).  This language simply does not make any provision for the reimbursement of hospitals that do not provide Medicare services.  The regulations that execute this statutory command track the statute's language.  The introduction to Part 413 begins by explaining that 42 U.S.C. § 1395g "requires that the Secretary make interim payments to providers."  42 C.F.R. § 413.1.  Again, there is no regulatory provision concerning Medicare reimbursement for non-Medicare providers.

While the Hospital is correct to assert that the regulations do not explicitly address a

situation in which the provider closes before the benefits are liquidated, the regulations need not do so.[6] This is because the Secretary has determined that the outcome should be the same, regardless of whether the provider remains open or instead makes a business decision to close or terminate its participation in Medicare. Using the discretion that Congress expressly granted him by statute, the Secretary has reasonably determined that these costs cannot be accurately reimbursed until they are liquidated, and this is true regardless of whether the provider elects to remain open or not.

So too is the Hospital generally right to suggest that it "*would be* entitled to Medicare reimbursement if it were still a Medicare participating hospital." Pl.'s Mem at 14 (emphasis added). This is precisely the Secretary's point. If the Hospital were still an operating Medicare provider and submitting cost reports every year, those cost reports would indicate the amount actually paid out that year under its postretirement health benefits plan. Because the benefits would have been actually paid, the Hospital would be in full compliance with the Secretary's reimbursement procedures as provided in the regulations and, citing 42 C.F.R. § 413.100(c)(2)(vii)(A), the Secretary would reimburse the Hospital for these actual costs.

The Hospital is flat wrong, however, to assert that "[i]t is undisputed that the retiree health costs at issue in this case are allowable costs under the Medicare program." Pl.'s Mem. at 14. This statement is indeed disputed, and the dispute is precisely the subject of this case. The

---

[6]  The Secretary is under no obligation to explicitly address in the regulations every factual scenario to which a regulation might apply. See, e.g. Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 95, (1995) ("As to particular reimbursement details not addressed by her regulations, the Secretary relies upon an elaborate adjudicative structure . . . . The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication . . . . The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate.") (citations omitted).

Secretary disputes this statement because it disregards 42 C.F.R. § 413.100(c)(2)(vii)(A), which provides that such costs are allowable in the year in which they are actually paid out.  A more accurate statement, which the Secretary would not dispute, is that *a portion of* these costs *would have become allowable* had the Hospital *continued participating in the Medicare program*.  In this hypothetical example, the Hospital would be making payments to former employees and submitting yearly cost reports.  The Hospital would thus be reimbursed each year for the portion of the benefits that were paid out that year.  The Secretary would not dispute the costs in this hypothetical example, and would reimburse the Hospital for them, because the costs "actually incurred" would be known.

Whether Congress and the Secretary should amend the Medicare Act and the regulations to permit reimbursement to non-providers is an issue beyond the scope of this case.  The Hospital has not challenged these relevant statutory and regulatory provisions, and it does not petition for the right to submit future cost reports as a non-provider.  Accordingly, any amount that the Hospital may have "actually paid" since it terminated its Medicare agreement, Pl.'s Mem. at 15,  is absolutely irrelevant.   The Secretary has committed firmly to the principle that postretirement health benefits plans, when unfunded, will not be reimbursed unless and until an active Medicare provider pays the beneficiary.  For this reason, the Secretary's application of 42 C.F.R. § 413.100(c)(2)(vii)(A) to disallow these costs is reasonable.

### D.  The Allowance of Sick Leave Benefits in This Case Does Not Render the Postretirement Health Benefits Allowable.

The Hospital points out an inconsistency in allowing costs for an unfunded sick leave benefits plan but not allowing costs for unfunded postretirement health benefits plan.  Pl.'s Mem. at 22-23.  The sick leave benefits were in fact unfunded, much like the postretirement health

benefits plan, and yet the cost was allowed.  Yet, as was explored at length in the PRRB hearing, the Intermediary's decision was based on a misunderstanding of the sick leave plan, believing that it was actually funded.  Testimony of Edward Hansmann, A.R. 128-35.  Had the Intermediary known that the plan was unfunded, it would not have allowed the costs:

> Q: Well, if you had known back when the audit was done that, in fact, [the sick leave liability] had not been funded, would you have allowed [it]?
> A: I probably would not have allowed it . . . .

A.R. 134.  The allowance of the sick leave cost was, quite simply, a factual mistake.  The Hospital can provide no legal support for its assertion that the Secretary must make the same mistake twice.

**IV.  The Hospital's Interpretation of the Reasonable Cost Regulations is Unprecedented, as Evidenced by the Absolute Lack of Case Law on Point.**

The two cases that the Hospital alleges are precedent for what it now asks the Court to do, <u>Sisters of St. Francis Health Services v. Schweiker</u>, 514 F.Supp. 607 (D.D.C. 1981)*,* and <u>St. Joseph's Hospital v. Blue Cross and Blue Shield Association/Blue Cross of Cal.</u>, 721 F.Supp. 1160 (N.D.Cal. 1989), are factually distinguishable and legally inapplicable.  While the fact patterns of those two cases resemble each other, both differ materially from the facts of this case.  More importantly, both cases were decided in a legal landscape that has since been dramatically altered by landmark U.S. Supreme Court decisions in Medicare law specifically and administrative law generally.

**A.  *St. Francis* Precedes *Chevron*, and Does Not Involve Postretirement Health Benefits.**

The Hospital relies almost exclusively on <u>St. Francis</u> to support its claim that case law

"dictates" reversal of the Secretary's disallowance.[7/]  Pl.'s Mem. at 17-18.  There, a hospital sought Medicare reimbursement for certain costs that were incidental to its closure, including unemployment compensation benefits that resulted from termination.  St. Francis, 514 F.Supp. at 610.  The total cost for these unemployment benefits was just under $38,000.  Id.  Although the unemployment benefits had vested prior to closing, they were not paid out until after the hospital had closed, and had been paid in full by the time the hospital submitted its final cost report.  Id.  Accordingly, when the Secretary was asked to make a reimbursement decision concerning the unemployment benefits, the precise amount of the cost that the provider had actually incurred – meaning, the precise amount of liquidation – had already been determined.

The district court reversed the HCFA Administrator and ruled that the costs were allowable.  After quoting the applicable regulations, the court emphasized that the cost at issue was for benefits that had actually been paid.  Id. at 614.  The fact that "the precise amounts of those costs were not known at the time of closing [of the hospital]" did not preclude reimbursement.  Id. at 615. The amount of liquidation was already known because the benefits had been paid prior to submitting the cost report.

Given these material factual differences, the logic of St. Francis applies with equal force to this case and explains the Secretary's decision not to reimburse the Hospital.  In contrast to the short-term unemployment benefits at issue in St. Francis, the postretirement health benefits at issue in this case are estimated to be paid out over a period of almost fifty years.  Their ultimate liquidation value will not be known until a time in the distant future, which the Hospital's actuaries estimate to be 2044, when the benefits have all been paid in full.  Not until that year

---

[7/] Of course, the district court decision in St. Francis is not binding in this case.

would the facts of this case become analogous to St. Francis.  Unlike short-term unemployment benefits, the precise amount of liquidation for long-term postretirement health benefits cannot be known at the time the benefits vest and the approximate cost is accrued.

The Secretary does not generally, and did not in this case, disallow the costs simply because "the precise amounts of those costs were not known at the time of closing."  Rather, the Secretary applied 42 C.F.R. § 413.100(c)(2)(vii)(A) and denied the costs in this case because, unlike St. Francis, the precise amounts were not known when the cost report was submitted. Indeed, twelve years later, they are still not known, as the ever-changing figures demonstrate.

In addition to these critical factual differences, the legal context in which St. Francis was decided, both in terms of administrative law generally and the applicable Medicare regulations specifically, was completely different. Although St. Francis was a Medicare reasonable cost case, the regulation that expressly addresses unfunded postretirement health benefit plans and thus governs this case, 42 C.F.R. § 413.100(c)(2)(vii)(A), was not at issue in St. Francis, for the obvious reason that it involved an entirely different category of benefits.  Indeed, the simple fact that St. Francis does not involve the specific reimbursement guidelines provided in 42 C.F.R. § 413.100(c)(2)(vii)(A), standing alone, renders that case irrelevant.

Perhaps more fundamentally, the entire legal landscape of administrative law has shifted since St. Francis was decided.  Three years after that decision, the U.S. Supreme Court issued its landmark opinion in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which established the level of deference to agency decisions now required of the federal courts.  The St. Francis court was not obligated to apply what is now universally known as Chevron deference to the agency's decision.  See Wayne County Gen. Hosp. v. Leavitt, 470

25

F.Supp. 2d 775, 780 (E.D. Mich. 2007) ("the D.C. Circuit issued its decision [in St. Francis]

before the Supreme Court opinion in [Chevron], which generally restricts the ability of courts to

overturn the reasonable decisions of agencies.").  Unlike the St. Francis court, this Court may not

reverse the Secretary unless his interpretation of the reasonable cost statute is inconsistent with

Congress's unambiguously expressed intent.  The Hospital cannot meet this newer and higher

threshold.

### B. The Hospital's Reliance on *St. Joseph's* is Unavailing Because the U.S. Supreme Court has Affirmed the Secretary's Interpretation of 42 U.S.C. § 1395X(v)(1)(A)(ii) as Merely a Book-Balancing Provision.

The Hospital contends that 42 U.S.C. § 1395X(v)(1)(A)(ii) "requires" the Secretary to

develop a process for the reimbursement of postretirement health benefits.  Pl.'s Mem. at 19.  In

effect, the Hospital suggests that this provision, known as "clause (ii)," somehow negates 42

C.F.R. § 413.100(c)(2)(vii)(A), which plainly holds that such reimbursement only occurs when a

Medicare provider has liquidated the cost of the benefits.  The Hospital thus interprets section

1395X(v)(1)(A)(ii) as requiring reimbursement where the Secretary's reasonable cost regulations

otherwise prohibit it, and further suggests that it should be done now because it was done in St.

Joseph's.  This line of reasoning fails to consider that since St. Joseph's, the U.S. Supreme Court

definitively held that the Secretary is not bound by the interpretation of § 1395X(v)(1)(A)(ii) that

the Hospital now advances.

In Good Samaritan Hospital. v. Shalala, 508 U.S. 402 (1993), several hospitals

challenged the Secretary's disallowance of wage costs that were in excess of clearly established

cost limits.  Id. at 407.  They argued, *inter alia*, that clause (ii) required the Secretary to

reimburse them for all supposedly reasonable costs regardless of whether those costs exceeded

26

the limits established in other regulations.  Id. at 408.   After the district court ruled in favor of

the hospitals and the court of appeals reversed, the U.S. Supreme Court affirmed the court of

appeals.  Id. at 420.

The hospitals argued that clause (ii) permitted the reconsideration of a cost allowability

decision if the provider believed the allowed amount was inadequate.  Id. at 410.  In effect, the

hospitals interpreted clause (ii) to provide a basis for compelling the Secretary to allow a cost

that he had previously determined was in excess of that dictated by application of the reasonable

cost regulations.  By contrast, the Secretary interpreted the clause to permit year-end adjustments

to prior mid-year payments that constituted an "anticipatory estimate of what the provider's

reimbursable costs will be, made before all relevant data are available."  Id. at 410.  In other

words, the Secretary makes estimated interim payments to providers during the cost year, so that

providers will not be forced to wait until after they file cost reports at the end of the year to

receive any Medicare reimbursement.  Id. at 406-07.  The Secretary's interpretation of clause

(ii) was that it merely authorized reconciliation of these interim estimated payments with the

payment actually determined to be due to the provider after the close of its cost-year.  Id. at 410.

By this interpretation, clause (ii) is merely a "book-balancing" provision that simply permits

subsequent adjustments to estimates of costs that were previously determined to be allowable.

Id. at 408.

The Supreme Court explained that both of the interpretations of clause (ii) advanced in

the case were plausible.  Finding the statute ambiguous, the APA required the Court to "defer to

[the] permissible interpretation espoused by the agency entrusted with its implementation."  Id.

at 414 (citations omitted).  It held that clause (ii) does not permit the "wide-range, ad hoc

27

reassessments" of reimbursement determinations that are based on the Secretary's reasonable

cost regulations.  Id. at 419.  Accordingly, since Good Samaritan was decided, courts have

consistently upheld the Secretary's interpretation of clause (ii) as merely a year-end book-

balancing provision and not a mechanism for substantively reconsidering a prior allowability

determination.  See, e.g., Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 455

(1999) (clause (ii) "refers to the year-end book balancing" and does not require "any particular

procedure for reopening reimbursement determinations"); Mt. Diablo Hosp. v. Shalala, 3 F.3d

1226, 1230-31 (9th Cir. 1993) (holding that Good Samaritan forecloses the ability of providers to

use clause (ii) to challenge the validity of the secretary's methodology for determining

reasonable cost limits).  The Supreme Court has thus made clear that the reconsideration of

substantive reasonable cost determinations is permitted not through clause (ii), but rather, "by

way of the arbitrary and capricious provision of the [APA]."  Good Samaritan, 508 U.S. at 420.

John Doyne now asks this Court to compel the Secretary to recognize an alternative

reading of clause (ii).  The Secretary found that the costs for the unfunded postretirement health

benefits are categorically unallowable under 42 C.F.R. § 413.100(c)(2)(vii)(A).  The Hospital is

not merely requesting a year-end reconciliation of mid-year interim payments with the amount of

reimbursement now determined to be due.  Rather, it is asking the Court to disturb the

Secretary's determination regarding reimbursement allegedly due past the last year in which the

Hospital participated in the program, under authority of clause (ii).  This Good Samaritan clearly

precludes.

This prohibition is the reason why John Doyne offers no legal precedent for its use of

clause (ii).  The single case cited in its brief, St. Joseph's, precedes Good Samaritan by nine

years.  The Hospital has not located a single case decided in the fifteen years since <u>Good Samaritan</u> in which clause (ii) was used in the way it now suggests, and of course, could not do so.

### C. The Hospital Disregards the Difference Between Postretirement Health Benefits and Termination Costs.

In addition to the abovementioned factual and legal differences, both <u>St. Francis</u> and <u>St. Joseph's</u> concern unemployment benefits, which are materially different from the unfunded postretirement health benefits at issue in this case.

When a hospital elects to close and terminate its Medicare provider agreement, there are two different kinds of costs that will appear on its next and final cost report.  Some costs are, properly speaking, termination costs – costs that result from termination of the Medicare agreement.  A typical example of termination costs is unemployment benefits for employees whose unemployment is caused by the hospital's closure.   A second and distinct kind of cost that might appear in the final cost report of a former Medicare provider is a cost that accrued prior to closure, and independently of the fact of closure, but that had not yet been reimbursed.  Such costs are not caused by the provider's termination of its Medicare provider agreement; rather, they already had accrued, but are outstanding at the time the hospital submits its final cost report.

This case involves the latter category of costs.  The postretirement health benefits at issue are not termination costs.  The Hospital's decision to close its doors and terminate its Medicare provider agreement did not cause the benefits to vest.  Rather, the benefits had previously vested, and at different times for different employees, depending on the date that their employment with the County began.  Upon the Hospital's closure, some employees elected to retire and claim their

vested benefits, while others decided to postpone their retirement and claim their benefits at a later date. Regardless of who retired at closing and who did not, the cost of the postretirement health benefits that the Hospital included in its final cost report was for benefits that had vested prior to, and independently of, the Hospital's closure. The Hospital claimed them in one lump sum when it closed not because they accrued at closure, but instead because it would not be submitting any additional cost reports in the future. The termination of its Medicare provider agreement meant that it would no longer be able to request Medicare reimbursement, and their inclusion of the costs of the postretirement health benefits in the final cost report was a last-ditch effort to claim these costs.

For this reason, the Hospital's attempt to locate a duty to reimburse for the postretirement health benefits cost in PRM 2176 is wrongheaded. That section of the PRM is entitled "Administrative Costs Incurred After Provider Terminates Participation in Program." PRM 2176. It pertains to costs that result from closure, not costs for benefits that vested independently of and prior to closure. Just as the Hospital observes, PRM 2176 "does not expressly address the costs at issue." Pl.'s Mem. at 21. This is because the costs at issue simply do not fall within the ambit of that section, and that section certainly cannot be read to compel their reimbursement.

The Hospital ultimately cannot demonstrate that the Secretary's decision is contrary to any statute, regulation, policy, or precedent. To the contrary, 42 C.F.R. § 413.100(c)(2)(vii)(A) and its application to this case are consistent with the overall statutory and regulatory regime for Medicare reimbursement and are grounded in sound policy. The Secretary's decision is therefore reasonable, and must be upheld.

30

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court deny
Plaintiff's motion for summary judgment and grant the Secretary's motion for summary
judgment.

                          /s/
                        JEFFREY A. TAYLOR
                        UNITED STATES ATTORNEY

                          /s/
                        CHRISTOPHER B. HARWOOD
                        Assistant United States Attorney
                        N.Y. Registration No. 4202982
                        Judiciary Center Building
                        555 Fourth Street, N.W.
                        Washington, D.C. 20530
                        (202) 307-0372

                          /s/
                        ANDREW B. SPALDING
                        Attorney
                        D.C. Bar No. 501297
                        U.S. Department of Health and Human Services
                        Office of the General Counsel
                        Centers for Medicare & Medicaid Services
                        Division
                        5309 Cohen Building
                        330 Independence Avenue S.W.
                        Washington, D.C.  20201
                        (202) 205-8705

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN L. DOYNE HOSPITAL,      )
                           )
          Plaintiff,     )
                           )
    v.                  )       Civil No. 1:07-CV-1592 JDB
                           )
                           )         **ECF**
MICHAEL O. LEAVITT, Secretary, U.S. )
    Department of Health and Human )
    Services,               )
                           )
         Defendant.    )
_____)

## <u>ORDER</u>

Upon consideration of the parties' cross-motions for summary judgment, oppositions and

replies thereto, and the entire record herein, it is this _____ day of _____, 2008,

ORDERED, that Plaintiff's Motion for Summary Judgment be, and hereby is, DENIED;

and it is further

ORDERED, that Defendant's Motion for Summary Judgment be, and hereby is,

GRANTED; and it is further

ORDERED, that judgment be, and hereby is, entered in favor of Defendant and against

Plaintiff.

 

                                  _____
                                  JOHN D. BATES
                                  United States District Judge

Copy to: ECF Counsel