UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN L. DOYNE HOSPITAL,

    Plaintiff,

        v.

CHARLES E. JOHNSON, Acting
Secretary, United States Department of
Health and Human Services,

    Defendant.

Civil Action No.  07-1592 (JDB)

## MEMORANDUM OPINION

    The Secretary of the Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), is responsible for determining whether, and to what extent, Medicare providers are entitled to reimbursement of the costs of providing services to Medicare beneficiaries.  This case involves a dispute over the final cost report submitted to CMS by the John L. Doyne Hospital ("the Doyne Hospital" or "Hospital") following its closure in December 1995.  As part of its final cost report, the Hospital sought reimbursement for the postretirement health insurance benefit costs of qualifying employees for the period 1996 through 2044, which it considered a reasonable cost of having provided Medicare services through the date of its closure.  The Secretary disallowed the claim, and the Hospital now seeks judicial review of that final agency action.  The parties have filed cross-motions for summary judgment, and the case is now ready for decision.[1]  For the reasons explained below, the Court will deny the

---

[1] For ease of reference, the Court will refer to the Doyne Hospital's memorandum in support of its motion for summary judgment as "Pl.'s Mem.," and defendant's memorandum in support of its cross-motion for summary judgment as "Def.'s Mem."  Citations to the administrative record will be indicated by "AR," followed by the record page number.

Hospital's motion for summary judgment, grant in part and deny in part the Secretary's motion for summary judgment, and remand the case to the Secretary for further proceedings.

## BACKGROUND

I.     **Statutory and Regulatory Background**

    A.     **The Medicare Program Generally**

This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., commonly referred to as the Medicare Act, which establishes a federally funded health insurance program for the elderly and disabled. See generally County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999). Part A of the Medicare Act typically covers "inpatient hospital services" furnished by participating providers. 42 U.S.C. § 1395d. Part A services are furnished by a "provider of services," such as a hospital, which must enter into an agreement with the Secretary in order to participate in and obtain payment from the Medicare program. Id. §§ 1395g, 1395cc, 1395x(u). The Secretary has delegated authority to administer the Medicare program to the Centers for Medicare & Medicaid Services. See 42 U.S.C. §§ 1395h, 1395u.

Private insurance companies, known as "fiscal intermediaries," acting as agents of the Secretary, process reimbursements to providers. 42 U.S.C. § 1395h. At the close of each fiscal year, a provider is required to file a Medicare cost report with its intermediary. 42 C.F.R. §§ 405.1801(b), 413.24(f). The intermediary then audits the cost report and makes a final determination of the total amount of reimbursement owed by Medicare. That final determination is set forth in a "notice of program reimbursement" or "NPR." 42 C.F.R. § 405.1803.

A provider dissatisfied with the amount of the award is entitled to request a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board"), an administrative body composed of five members appointed by the Secretary who must be "knowledgeable in the field

of payment of providers of services." 42 U.S.C. § 1395oo(a), (h). The Board has the authority to affirm, modify, or reverse the final determination of the intermediary. Id. § 1395oo(d). By request, or on its own motion, a decision by the Board is subject to review by the Secretary's delegate, the Administrator of CMS. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. Once a final decision is rendered, the provider may seek judicial review of the final agency decision in federal district court within 60 days. 42 U.S.C. § 1395oo(f)(1).

   B.   The "Reasonable Cost" Standard

The principles of reimbursement for the costs at issue here are set out in the reasonable cost provision codified at 42 U.S.C. § 1395x(v)(1)(A) and its implementing regulations at 42 C.F.R. § 413.100 (1995).[2] Congress defined "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services" and authorized the Secretary to issue regulations establishing the methods to be used in determining reasonable costs. 42 U.S.C. § 1395x(v)(1)(A). Congress further provided that "[s]uch regulations . . . may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services . . . , and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs." Id. Reasonable cost includes items such

---

[2] Since 1983, Medicare reimbursement has been based primarily on the Prospective Payment System, under which providers are reimbursed based on prospectively fixed rates for each discharge, based on the patient's diagnosis, regardless of actual costs. See County of Los Angeles,192 F.3d at 1008. However, certain Medicare costs are still determined on a retrospective reasonable cost basis. See Battle Creek Health Sys. v. Leavitt, 498 F.3d 401, 403 (6th Cir. 2007). The parties have agreed that the reasonable cost standard governs resolution of this matter.
   All citations to the reasonable cost regulations are to the 1995 version of the Code of Federal Regulations, the version in effect at the time of the Hospital's final cost reporting period.

as "administrative costs, maintenance costs, and premium payments for employee health and pension plans." 42 C.F.R. § 413.9(c)(3).

Pursuant to § 1395x(v)(1)(A), the Secretary has adopted the "accrual" method of accounting to calculate reimbursement of "reasonable costs." See 42 C.F.R. § 413.24(b)(2), (e). Under the accrual method, "revenue is reported in the period in which it is earned, regardless of when it is collected; and an expense is reported in the period in which it is incurred, regardless of when it is paid." Id. § 413.24(b)(2). The Secretary has determined, however, that some liabilities associated with accrued costs may never be fully liquidated through an actual expenditure of funds, which may result in the Medicare program paying for costs that a provider never pays. 60 Fed. Reg. 33126, 33126 (June 27, 1995). He cited as an example employee sick leave days that are subject to forfeiture if the employee is discharged for cause, noting that some providers have sought Medicare payment for employee sick leave days for which the provider never became liable. Id. To minimize the unwarranted payment of federal funds in such cases, the Secretary issued regulations requiring the timely liquidation of liabilities associated with certain types of accrued cost, including vacation pay, sick leave, and most importantly for this case, deferred compensation. Id. 33134-135. These regulations are codified, in relevant part, at § 413.100.

Section 413.100 memorializes these principles as follows:

> (a) *Principle*. . . . In the case of accrued costs described in this section, for Medicare payment purposes the costs are allowable in the year in which the costs are accrued and claimed for Medicare payment only under the conditions set forth in paragraph (c) of this section.
> . . . .
> (c) *Recognition of accrued costs*. (1) *General.* Although Medicare recognizes in the year of accrual, the accrual of costs for which a provider has not actually expended funds during the current cost reporting period, for purposes of payment Medicare does not recognize the accrual of costs unless the related liabilities are liquidated timely.

One of the eight types of liabilities subject to the timely liquidation requirement of § 413.100(c) is "deferred compensation." As to deferred compensation, the regulation provides

that "[r]easonable provider payments made under unfunded deferred compensation plans are included in allowable costs <u>only during the cost reporting period in which actual payment is made to the participating employee.</u>" § 413.100(c)(2)(vii)(A) (emphasis added).  It expressly provides that "[p]ostretirement benefit plans" constitute deferred compensation arrangements and, hence, are subject to the regulation.  <u>Id.</u> § 413.100(c)(2)(vii)(C).

## II.     Factual Background[3]

The Doyne Hospital was a general acute care hospital in Milwaukee, Wisconsin, providing services to Medicare beneficiaries pursuant to a Medicare provider agreement for nearly 30 years, until it voluntarily terminated its operations and ceased participation in the Medicare program on December 22, 1995.  AR 22, 770.  As a result of the Hospital's closure, some Hospital employees retired, some transferred to other County departments, and others were terminated from employment with the County.  <u>Id.</u> at 771.

Milwaukee County, the owner and operator of the Hospital, is obligated by local law and union contracts to provide postretirement health insurance benefits to County employees under certain circumstances.  AR 771.  Under the Milwaukee County Code, employees of the Hospital hired before January 1, 1994 who worked for the Hospital and other County agencies for a minimum of 15 years have a vested right to postretirement health insurance benefits, with the benefits extending to spouses and eligible dependents.  <u>Id.</u>  The Hospital's postretirement health benefit plan, however, was "unfunded," which means that the Hospital had not set aside funds in a custodial bank account, trust account, or with an insurance company to cover the cost.  Pl.'s Mem.

---

[3] The factual background is drawn primarily from the Corrected Joint Stipulation of Facts submitted by the Hospital and the intermediary to the Provider Reimbursement Review Board. AR 768-74.  Although not a party to the stipulation, the Secretary does not dispute the correctness of the stipulations on this appeal.

at 12; Def.'s Mem. at 9; Provider Reimbursement Manual § 2140.3.B.1.[4]  Prior to its closure, the Hospital made postretirement health benefit payments to eligible retirees.  AR 771.  In accordance with the accounting principles set forth in 42 C.F.R. § 413.24(a), the County recorded expenses for the postretirement health benefits on a cash basis and reported related costs to the Medicare program in the year in which the expenses were paid.  Id.  The County has continued to make payments to retirees after the Hospital's closure.  Id.

The County submitted its cost report for the period ending December 22, 1995, in May 1996 -- its final cost report -- and included therein a claim for reimbursement based on liabilities that had been incurred through the date the County terminated its participation in the Medicare program.  Id. at 772.  This cost report included a claim for payments of postretirement health benefits it had made through the date of closure, which the intermediary agreed were allowable.  Id. at 479, 646.  On July 31, 1998, the County submitted an amendment to the final cost report to the intermediary claiming, inter alia, "additional postretirement health benefit costs" in the amount of $8,140,171.[5]  Id. at 772.  This amount was based on the amounts the County had paid to retirees in 1996 and 1997 and its projected costs through the year 2044.  Id. at 772-73.

On January 18, 2000, the intermediary issued an NPR to the County disallowing the amended claim for postretirement health benefit costs.  Id. at 773.  The County then filed a notice of appeal with the PRRB.  Id.  By letter dated April 26, 2004, while the appeal was still pending,

---

[4] The Provider Reimbursement Manual is CMS Publication 15-1, available at http://www.cms.hhs.gov/Manual/PBM.

[5] This amount was based on a total of $139,961,673 in net present value costs for retiree health benefits, subject to the applicable Medicare recovery percentage of 5.816 percent.  AR 772.  The net present value, in turn was based on the amount paid by the County for retirees in 1996 and 1997 -- $13,392,120 -- and a future years projection of $126,569,553.  Id.

the County submitted an updated claim to the intermediary reflecting the actual costs of retiree health benefits from 1996 through 2002 and "refinements" to the assumptions used in its calculations for the years 2003 through 2044.  Id.   The updated claim requested payment for postretirement health benefit costs in the amount of $12,107,189, an increase of nearly 50 percent.[6]  Id. at 773-74.

The PRRB held an evidentiary hearing on March 9, 2006, and issued its decision on May 10, 2007.  The Board affirmed the intermediary's decision disallowing the Hospital's claim for postretirement health benefit costs, finding that 42 C.F.R. § 413.100(c)(2)(vii) dictated the disallowance -- that is, "[r]easonable provider payments made under unfunded deferred compensation plans are included in allowable costs only during the cost reporting period in which actual payment is made to the participating employee."  AR 18 (quoting § 413.100(c)(2)(vii)(A)). Although not plainly stated on the face of the decision, it is apparent that the Board disallowed the postretirement health benefit costs actually paid by the Hospital from 1996-2002 during the pendency of the appeal because those payments were made after the cost reporting period under review -- that is, the cost reporting period ending December 22, 1995.  Id.  at 17-18.  The Board did not address the validity of the Hospital's methodology for projecting future costs, having categorically disallowed the claim for costs.  Id.

On July 9, 2007, the CMS Administrator issued a notice declining to review the Board's decision, and hence, the Board decision became the Secretary's final decision.  AR 1.  The

---

[6]   By 2004, the County had actual cost data for the period 1996-2002, showing it had paid postretirement health benefit costs in the amount of $44,331,623; it also had increased its projected future costs through 2044 to be $393,692,826.  AR 773-74.  The total retiree health costs of $438,024,449, discounted to its net present value in 1997 dollars, came to $208,170,377, which was then subject to the Medicare recovery percentage of 5.816 percent.  Id.

Hospital filed its complaint seeking judicial review of this decision on September 9, 2007, requesting that the Court vacate the Secretary's decision and issue an order compelling the Secretary to reimburse the Hospital for all retiree health benefits paid to date and for all estimated future costs of those benefits. Compl. at 13-14. During the course of this litigation, the Hospital submitted a revised estimate of the costs of the postretirement health benefits in the amount of $11,049,847, and requested an order for that amount.[7]  Pl.'s Mem. at 7-8.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997). Summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Under the APA, the Administrator's decision can be set aside only if it is "unsupported by

---

[7] The Hospital based this revised estimate on actual cost data for the period 1997 through 2007 and a revised projection for the period 2008 through 2044, based on the assessment of a certified actuary who applied the same actuarial assumptions originally used before the PRRB. See Pl.'s Mem. at 7-8.

substantial evidence," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) and (E); see 42 U.S.C. § 1395oo(f)(1) (providing that judicial review of Medicare reimbursement decisions shall be made under APA standards); St. Elizabeth's Med. Ctr. of Boston v. Thompson, 396 F.3d 1228, 1233 (D.C. Cir. 2005).  The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  That is, it is not enough for the agency decision to be incorrect -- as long as the agency decision has a rational basis, the court is bound to uphold it.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  The court may only review the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id.

A court should review an agency's interpretation of a statute under the familiar two-step analysis outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The first step is determining whether Congress has spoken directly to the "precise question at issue," for if it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43.  If, however, the statute is silent or ambiguous on the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.  When the agency's construction of a statute is challenged, its "interpretation need not be the best or most natural one by grammatical or other standards . . . .  Rather [it] need be only reasonable to warrant deference." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991) (citations omitted).

Furthermore, an agency's interpretation of its own regulation is entitled to substantial deference.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("We must give

substantial deference to an agency's interpretation of its own regulation."). Hence, courts "must defer to the agency's interpretation unless 'an alternative reading is compelled by the regulation's plain language.'" Carus Chem. Co. v. EPA, 395 F.3d 434, 439 (D.C. Cir. 2005) (quoting Thomas Jefferson Univ., 512 U.S. at 512).

**DISCUSSION**

The Hospital contends that payment is required under the Medicare reasonable cost provision, 42 U.S.C. § 1395x(v)(1)(A), because the County's obligation to pay the postretirement health benefits was a cost of services provided to Medicare beneficiaries while the Hospital was a Medicare participating provider. The Hospital focuses on its right to payment, first, under the deferred compensation regulation, 42 C.F.R. § 413.100(c)(2)(vii)(A), recognizing the costs of such plans as allowable, and next, under the Provider Reimbursement Manual provision recognizing that this type of cost is allowable as part of a provider's termination costs. See Pl.'s Mem. at 14-20, 21-22. In response, the Secretary contends that he has acted within his discretion in applying the principles of reasonable cost reimbursement set out in the regulations at § 413.100 to the Hospital to disallow unfunded post-termination costs. In his view, disallowing the speculative costs associated with postretirement health benefits absent timely liquidation of the accrued costs furthers the policy of ensuring accuracy in reimbursement. See Def.'s Mem. at 22-26.

The Court concludes that the Secretary has reasonably applied 42 C.F.R. § 413.100 to disallow payment for the Hospital's postretirement health benefit costs after its termination and that this application is consistent with the statute. As a threshold matter, the Court observes that, to the extent the Hospital relies on the text of § 1395x(v)(1)(A) standing alone as mandating payment for these costs, that reliance is misplaced. Section 1395x(v)(1)(A) directs that reasonable

cost "shall be determined in accordance with regulations establishing the method or methods to be used," and further provides that the agency "may provide for using different methods in different circumstances," and "may provide for the establishment of limits on the direct or indirect overall incurred costs."  The deferred compensation regulation, 42 C.F.R. § 413.100(c)(2)(vii), is one such regulation limiting reimbursement of indirect costs, and the Hospital's alleged entitlement to payment must be viewed through the lens of this regulation.

Section 413.100(c)(2)(vii)(A) plainly permits deferred compensation to be claimed as an allowable cost "only during the cost reporting period in which actual payment is made to the participating employee," to ensure that such costs are reimbursed only to the extent actually incurred.  Id. The Hospital has not mounted a challenge to § 413.100; ironically, the Hospital actually relies on the regulation to support its claim that the costs are allowable.  See Pl.'s Mem. at 14.  But an important component of the Hospital's argument is that, to the extent that the timely liquidation requirement -- "actual payment" during the cost reporting period -- is applied to providers that have terminated operations, the regulation is contrary to § 1395x(v)(1)(A) and is irrational.  See Pl.'s Mem. at 17-18, 20-21.  The Court, hence, turns to that argument.

The Secretary has broad discretion to develop regulations implementing the reasonable cost concept set forth in § 1395x(v)(1)(A).  See Villa View Community Hosp. v. Heckler, 728 F.2d 539, 540 (D.C. Cir. 1984) ("Congress has given the Secretary considerable discretion to promulgate cost-reimbursement regulations that give meaning to the term 'reasonable costs.'"); Battle Creek Health Sys., 498 F.3d at 410 ("the Medicare Act grants the Secretary broad discretion to determine which 'reasonable costs' may be reimbursed"); Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 77 (1st Cir. 2006) (same).  With respect to "indirect costs," such as employee health benefit plans, the statute explicitly authorizes the Secretary to

"provide for the establishment of limits on the . . . indirect" costs that may be recognized as "reasonable." Wayne County Gen. Hosp. v. Leavitt, 470 F. Supp. 2d 775 (E.D. Mich. 2007) (quoting § 1395x(v)(1)(A)).  Considering the ambiguity inherent in "limits on the . . . indirect . . . costs that may be recognized as reasonable" and the broad delegation of authority to issue regulations developing the "reasonable cost" concept, the validity of the timely liquidation requirement in § 413.100(c)(2)(vii)(A) must be considered under the second step of Chevron.  In other words, the Court must consider whether the agency's approach to unfunded deferred compensation is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843.

       The Secretary has reasonably explained in the preamble to the regulations at issue that the timely liquidation requirement is necessary to ensure that the agency does not pay expenses that are never actually incurred, explaining in one example that a provider may otherwise receive an unwarranted payment from Medicare for employee benefits that the employee later forfeits. See 60 Fed. Reg. at 33126, 33129-130.  The Secretary has further explained that, as a result, the costs of unfunded deferred compensation plans, in particular, would be paid "only during the cost reporting period during which actual payment is made to the participating employee." Id. at 33133.  The Secretary noted that this requirement is equally applicable when a provider goes out of business, for "it is still necessary for the provider to timely liquidate liabilities for expenses paid by the Medicare program." Id. at 33128-29.  The Secretary also singled out post-retirement health benefit plans as being one form of deferred compensation that is expressly covered by the regulation.  60 Fed. Reg. at 33134; 42 C.F.R. § 413.100(c)(2)(vii)(C).  Although unstated, the reason for subjecting postretirement benefit plans, in particular, to a timely liquidation requirement is self-evident -- the cost of such plans is particularly speculative considering that such costs are dependent on, inter alia, the longevity of the covered employees.  See Pl.'s Mem. at

6 (acknowledging that "actuarial assumptions" must be made to determine costs at issue, including use of 2044 as the terminating date); Def.'s Mem. at 24 (noting that ultimate liquidation value of postretirement health benefits will not be known until the distant future).

Considering the substantial risk of overpayment described by the Secretary, the Court concludes that he acted reasonably and within his authority in determining that Medicare will only pay for unfunded deferred compensation as an allowable cost for the cost reporting period in which actual payment is made. Although the Hospital posits alternative ways in which the Secretary may address the concern about overpayment for speculative future costs, it was not arbitrary or capricious for the Secretary to select the method he did.[8]

The facts here demonstrate that the Secretary's application of § 413.100 to the Doyne Hospital, in particular, is reasonable. As the Hospital acknowledges, its projected estimate of costs for the postretirement health benefit plan have fluctuated substantially since it began the exercise of trying to predict the total costs from its closure in 1995 to the projected last date of paying benefits in the year 2044. In 1998, it estimated the costs for this 49-year period would total $8,140,171. AR 772. By 2004, the estimate was revised by almost 50 percent to $12,107,189. Id. 773-74. Four years later, the number had decreased to $11,049,847. See Pl.'s Mem. at 7-8. It

---

[8] The Court rejects the Hospital's contention that the intermediary's inconsistent treatment of the Hospital's request to be reimbursed for its employees' unfunded sick leave benefits (payable on retirement) warrants a different result. See Pl.'s Mem. at 22-23. The record clearly establishes that the intermediary believed that the employees' sick leave was funded by the County based on the text of certain records, although this turned out to a factual mistake. See AR 57, 129-30, 133-34 (testimony from the intermediary that, at the time he approved the sick leave as an allowable cost, he "understood . . . that this was a fund that was set aside by the County to fund this sick and vacation accrual"). There is no basis in logic or the law to require the Secretary to repeat the mistake with respect to the unfunded postretirement health benefit costs at issue. Additionally, since the matter of sick leave was not the subject of the appeal, there was no occasion for the Board to take corrective action on that aspect of the NPR.

is just such speculative cost projections that the Secretary has reasonably concluded should not be reimbursed.

The Hospital contends that two cases demonstrate that Medicare is nonetheless required to pay a provider for the post-termination costs of employee benefits where those costs were attributable to prior services rendered to Medicare beneficiaries, citing Sisters of St. Francis Health Servs. v. Schweiker, 514 F. Supp. 607 (D.D.C. 1981), and St. Joseph's Hosp. v. Blue Cross and Blue Shield Ass'n of California, C-83-4041-MHP (N.D. Cal. Sept. 4, 1984).[9]  But there is no indication in those decisions that "unfunded" deferred compensation was involved, nor were those courts presented with the issue of how § 413.100 should be weighed.  Thus, those cases shed no light on whether the Hospital is entitled to the costs at issue.

The Hospital characterizes the Secretary's refusal to pay for the costs at issue as effectuating an impermissible shifting of Medicare costs to non-Medicare individuals (the County taxpayers) in contravention of the anti-cost shifting provision of § 1395x(v)(1)(A)(i).[10]  But that argument ignores the portion of the same subsection providing that the Secretary "may provide for the establishment of limits on the . . . indirect" costs that may be recognized as "reasonable."  See Wayne County Gen. Hosp., 470 F. Supp. 2d at 780 (holding that agency methodology reducing the amount of provider's reimbursement did not "force the costs associated with . . . Medicare

---

[9] The unpublished district court opinion in St. Joseph's Hosp. is not in the administrative record, nor has it been provided by plaintiff.  There is only a brief discussion of the decision in a PRRB document in the administrative record.  See AR 410-12.  Thus, the Court is constrained from relying on it in any event.

[10] That provision states:  "Such regulations shall (i) take into account both direct and indirect costs of provider services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] . . . will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs [i.e., Medicare]."  § 1395x(v)(1)(A)(i).

patients" onto non-Medicare patients because § 1395x(v)(1)(A) authorizes reasonable "limits" on "indirect costs").  Where the Secretary reasonably limits indirect costs, no impermissible cost-shifting has occurred.  See also Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 418 (1993) (recognizing that reasonable cost limits "by virtue of their being generalizations . . . necessarily will fail to yield exact numbers -- to the detriment of health care providers at times . . . ").  In light of the Court's determination that the limits on reimbursement of unfunded deferred compensation are reasonable, it necessarily follows that no impermissible cost-shifting has occurred.

The Hospital argues, in the alternative, that it is entitled to payment for the costs of its postretirement health benefits plan as a "termination cost" under § 2176 of the Provider Reimbursement Manual and that the PRRB acted inconsistently with § 2176.  The Hospital contends that the costs at issue are of the same nature as the examples listed in § 2176 -- "salaries and those costs associated with such salaries, i.e., fringe benefits, workmen's compensation insurance, and payroll taxes . . . ," which the Secretary treats as allowable costs even though they are paid after the provider closes.[11]  Id. § 2176.

In response, the Secretary, through litigation counsel, now contends that the Hospital may not seek reimbursement of those costs under § 2176 because the costs "do not fall within the ambit of that section," which it characterizes as "pertain[ing] to costs that result from closure, not costs for benefits that vested independently of and prior to closure."  See Def.'s Mem. at 30.  Neither the PRRB nor the Secretary made this statement during the administrative proceedings

---

[11] The Hospital also makes the argument that the Secretary's refusal to pay the costs at issue is inequitable because current participating providers continue to get reimbursed for the very same type of costs.  See Pl.'s Reply at 7-8.  This argument circles back to its alleged entitlement under § 2176, which it calls "the only available process" for a terminated provider to seek reimbursement of the costs at issue.  See Pl.'s Mem. at 21-22.

below or otherwise addressed the Hospital's argument under § 2176, which the Hospital clearly raised in its administrative appeal.  See AR 18-19; AR 484-86 (Provider's Final Position Paper) ("the Provider Reimbursement Manual allows reimbursement for costs incurred after a provider terminates its participation in the Medicare program," including "salaries, fringe benefits, and other expenses associated with the collection of amounts due the Hospital for services it rendered while it participated in the Medicare program"); see also A.R. 27-28 (Provider's Post-Hearing Brief) ("Milwaukee County complied with Section 2176").  Nor has the Court found in the administrative record the limitations delineated by counsel.

      The reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency," and may not consider counsel's post hoc explanations.  Clark County, Nevada v. FAA, 522 F.3d 437, 448 (D.C. Cir. 2008) (quoting SEC v. Chenery, 332 U.S. 194, 196 (1947)).  The Court is thus precluded from considering counsel's assertion that § 2176 has no applicability to postretirement health benefit costs.  Instead, a remand for further explanation is the appropriate remedy in this situation.  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course . . . is to remand to the agency for additional . . . explanation"); Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C.Cir. 2001) (same).

      The Court emphasizes that the Secretary's silence on § 2176 is significant because a postretirement health benefit plan is, in lay terms, commonly understood as a "fringe benefit" -- a term used in § 2176 -- raising a substantial question as to why at least some of these costs are not considered allowable termination costs.  Furthermore, there are some cursory references in the administrative record to other PRRB decisions that have apparently allowed postretirement health benefit plans to be paid as part of termination costs -- conflicting with the bright-line per se rule

that is argued by the Secretary's counsel now. See AR 365-68 (Wayne County Hosp. v. Blue Cross and Blue Shield Ass'n, PRRB Decision No. 2004-D44 (Sept. 24, 2004), observing that the intermediary reached an "administrative resolution" with a terminated provider to pay, inter alia, "$11,026,444 of retirees' health and life insurance costs' and nearly $5 million in additional retirement costs, and that the intermediary believed these were termination costs under § 2176);[12] AR 410-12 (St. Joseph's Hosp. v. Blue Cross and Blue Shield Ass'n, PRRB Decision No. 83-D104R (July 1, 1986), leaving unresolved on remand from district court whether pension plan costs may be regarded as "costs unique to closing," and hence termination costs).  Therefore, the Court will remand this action to the Secretary to address the Hospital's claim that it is entitled to recover the costs at issue as "termination costs" under § 2176 of the Provider Reimbursement Manual.[13]

## CONCLUSION

For the foregoing reasons, the Court will deny the Doyne Hospital's motion for summary judgment and will grant in part and deny in part the Secretary's motion for summary judgment. The Secretary is entitled to summary judgment on his decision to disallow the costs of the Hospital's postretirement health benefit plan paid after the cost reporting period ending December 22, 1995, pursuant to 42 C.F.R. § 413.100(c)(2)(vii)(A).  This action is remanded to the Secretary

---

[12] The Board's decision in Wayne County Hosp. focused on which years the costs should be attributable to -- the issue appealed -- and held in favor of the provider.  The Secretary overturned this aspect of the Board's decision, and was affirmed by the district court.  See Wayne County Hosp., 470 F. Supp. 2d at 778.

[13] One possible outcome on remand is that the Secretary will offer the same explanation on remand that his counsel offers in this litigation.  If so, the Secretary should, at a minimum, explain whether he has consistently disallowed postretirement health benefit plan costs as termination costs under § 2176 and also explain how the Board decisions referenced herein are reconciled with that disallowance.

for further proceedings on the Hospital's request for payment of these costs as termination costs under § 2176 of the Provider Reimbursement Manual. A separate Order accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: March 30, 2009